# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**RANDY M. FISHER**
Leonard, Hammond, Thoma & Terrill
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**BRIAN REITZ**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| ERASMO LEYVA, JR., ) | |
| ) | |
| Appellant-Defendant, ) | |
| ) | |
| vs. ) | No. 02A03-1111-CR-535 |
| ) | |
| STATE OF INDIANA, ) | |
| ) | |
| Appellee-Plaintiff. ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable John F. Surbeck, Jr., Judge
Cause No. 02D04-1007-FA-39

**July 25, 2012**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Erasmo Leyva, Jr., appeals his conviction for child molesting as a class A felony.[1] Leyva raises one issue, which is whether the evidence is sufficient to sustain Leyva's conviction for child molesting as a class A felony. We affirm.

The facts most favorable to the conviction follow. Leyva has three children, A.L., B.L., and E.[2] A.L., who was born on March 19, 1999, and B.L. lived with their mother, Leyva's former spouse, and visited Leyva every other weekend. Leyva, who was born on June 28, 1978, lived with his wife and son E.

From April 2, 2010, to April 4, 2010, A.L. and B.L. visited Leyva to celebrate Easter and their birthdays. On April 3, 2010, Leyva, his wife, A.L., B.L., and E. were watching a movie in the family room. Leyva's wife, E., and B.L. watched the movie while on the floor, and Leyva and A.L. watched the movie from the couch. At some point, Leyva's wife, B.L., E., and A.L. fell asleep.

At approximately 12:30 a.m., A.L., who was wearing pajama shorts and underwear and was on her back, woke up and felt that Leyva had his hand down her pants and underwear. Leyva inserted more than one of his fingers into A.L.'s vagina, which "[k]ind of hurt," and A.L. turned onto her side. Transcript at 38. A.L. then looked at the clock, stood up and walked into the kitchen, and then walked upstairs to use the restroom and look for a phone to call her mother. A.L. was unable to find a phone and went back downstairs. Leyva was at the bottom of the steps when A.L. returned downstairs and asked A.L. what she was doing, and A.L. said that she had gone to the bathroom. A.L. grabbed a blanket and lay down by Leyva's wife, and Leyva lay down on the couch.

---

[1] Ind. Code § 35-42-4-3 (Supp. 2007).

[2] E. is indentified by first name only in the record.

2

When A.L. was on the floor next to Leyva's wife, she noticed a phone on the floor but did not try to call her mother because she was scared that Leyva was watching her.

On April 4, 2010, A.L. did not say anything about Leyva's actions because she was scared, and eventually A.L.'s mother arrived to pick up A.L. and B.L. As they were driving, A.L. told her mother that she needed to talk to her. After they arrived home, A.L. took her mother into her bedroom and told her what had happened. A.L.'s mother took A.L. to the emergency room and later to the police station. A.L. was interviewed by Julie DeJesus, a forensic interviewer at the Dr. Bill Lewis Center for Children, and examined by Michelle Ditton, the chief nursing officer and a sexual assault nurse examiner at the Fort Wayne Sexual Assault Treatment Center.

On July 29, 2010, the State charged Leyva with Count I, child molesting for performing or submitting to deviate sexual conduct with A.L. as a class A felony, and Count II, child molesting for performing or submitting to fondling or touching with A.L. as a class C felony. At trial, the jury heard testimony from, among others, A.L., Erica Flegel, a forensic scientist with the Indiana State Police Laboratory, DeJesus, Ditton, Leyva, Leyva's wife, and A.L.'s mother. Flegel testified that male DNA was identified in A.L.'s underpants but that the quantity was insufficient to positively identify the person. DeJesus testified regarding A.L.'s disclosure of sexual abuse and identification of Leyva. Ditton testified that A.L. had no injuries and, when asked about the frequency of injuries of victims of sexual abuse which involves penetration of the female sex organ, indicated that ninety to ninety-five percent of victims have completely normal exams.

Leyva testified that A.L. used to be his "little princess" and that "[t]he older she got the more problems came," that over the years A.L. changed, and that "[i]t's a lot of materialism, a lot of selfishness. Just not what it used to be." Id. at 167, 169. Leyva testified that A.L. was upset because the birthday party for A.L. and B.L. was on B.L.'s birthday and not her birthday and that during the movie A.L.'s brother took her spot, and that A.L. threw a fit, held her stomach, threw herself on the couch, and refused to watch the movie. During cross examination, A.L. indicated that she was upset that her brother had taken her spot and that she had been upset because Leyva had not purchased her the "burberry" she had wanted for her birthday. Id. at 51. Also, when asked which hand Leyva used to touch her and which fingers he inserted into her vagina, A.L. answered that she did not know. A.L. further testified that Leyva inserted more than one finger into her vagina. The jury found Leyva guilty on Counts I and II. The court merged Count II into Count I, entered judgment of conviction on Count I, and sentenced Leyva to twenty years in the Department of Correction.

The issue is whether the evidence is sufficient to sustain Leyva's conviction. When reviewing the claim of sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. Jones v. State, 783 N.E.2d 1132, 1139 (Ind. 2003). We look only to the probative evidence supporting the verdict and the reasonable inferences therein to determine whether a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable doubt. Id. If there is substantial evidence of probative value to support the conviction, it will not be set aside. Id. Ind. Code § 35-42-4-3 provides in part: "[a] person who, with a child under fourteen (14) years of age,

4

performs or submits to sexual intercourse or deviate sexual conduct commits child molesting, a Class B felony" and that "[h]owever, the offense is a Class A felony if . . . it is committed by a person at least twenty-one (21) years of age . . . ."

Leyva argues that the evidence is insufficient to support his conviction. Leyva asserts that A.L.'s testimony is incredibly dubious and not corroborated by any other evidence presented by the State, that A.L. alleged that he molested her while the entire family was sleeping in their family room, that no one heard or saw the alleged conduct, that A.L. spent the entire next day engaged in family activities with Leyva for Easter, and that A.L.'s testimony regarding the details of the evening are completely inconsistent with that of Leyva and his wife at trial. Leyva further argues that no physical injuries to A.L. were found. Leyva also maintains that A.L. had several motives to lie about the incident, including that A.L. was upset because her birthday party was cancelled and she was forced to share a party with a sibling, and because Leyva did not "get a Blackberry for her birthday" as she expected. Appellant's Brief at 13. Leyva argues that A.L. was also upset the night of the incident because her brother took her spot for the movie, and that she threw a fit, jumped on the couch, and refused to watch the movie. Leyva also points to the fact that A.L. could not testify as to which hand or fingers of Leyva were in her pants or vagina. The State argues that the evidence is sufficient to sustain Leyva's conviction, that A.L.'s testimony was not incredibly dubious, and that the jury weighed Leyva's claims regarding A.L.'s motive to fabricate the story and rejected the alternate theory.

5

To the extent Leyva asserts that the incredible dubiosity rule requires reversal of his conviction, we note that the rule applies only in very narrow circumstances. See Love v. State, 761 N.E.2d 806, 810 (Ind. 2002). The rule is expressed as follows:

> If a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence, a defendant's conviction may be reversed. This is appropriate only where the court has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it.

Id. Leyva fails to show that the testimony of A.L. was inherently contradictory. To the extent A.L.'s testimony conflicted with the testimony of Leyva or his wife or Leyva argues that A.L.'s testimony was less believable, we note that this is an issue of witness credibility. The function of weighing witness credibility lies with the trier of fact, not this court. Whited v. State, 645 N.E.2d 1138, 1141 (Ind. Ct. App. 1995). We cannot reweigh the evidence and judge the credibility of the witnesses. See Jones, 783 N.E.2d at 1139. Further, we cannot say that the testimony of A.L. regarding Leyva's actions, including A.L.'s testimony that she awoke and felt Leyva insert more than one of his fingers into her vagina while Leyva's wife, B.L., and E. slept on the floor after watching a movie, was so inherently improbable that no reasonable person could believe it. Leyva does not show how the testimony against him was somehow internally inconsistent and has not shown A.L.'s testimony to be incredibly dubious.

Based upon our review of the evidence and testimony most favorable to the conviction as set forth in the record and above, we conclude that sufficient evidence exists from which the trier of fact could find Leyva guilty beyond a reasonable doubt of

child molesting as a class A felony.  See Hampton v. State, 921 N.E.2d 27, 29 (Ind. Ct. App. 2010) (finding that the testimony of the seven-year-old victim was not incredibly dubious and concluding that based upon the record the State presented evidence of probative value from which a reasonable jury could have found the defendant guilty of child molesting as a class A felony), reh'g denied, trans. denied; Surber v. State, 884 N.E.2d 856, 869 (Ind. Ct. App. 2008) (holding that the testimony of six-year-old victim was not incredibly dubious despite some inconsistencies, and that such inconsistencies are appropriate to the circumstances presented, the age of the witness, and the passage of time between the incident and the time of her statements and testimony), trans. denied.

For the foregoing reasons, we affirm Leyva's conviction for child molesting as a class A felony.

Affirmed.

KIRSCH, J., concurs.

BAKER, J., dissents with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ERASMO LEYVA, JR., | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No.  02A03-1111-CR-535 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

**BAKER, Judge, dissenting.**


I respectfully dissent.  I believe that A.L.'s testimony is incredibly dubious and that the evidence is, therefore, insufficient to support Leyva's conviction for class A felony child molesting.

As noted by the majority, the doctrine of incredible dubiosity allows a reviewing court to reevaluate the credibility of a witness when "a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence." Love v. State, 761 N.E.2d 806, 810 (Ind. 2002).  The "[a]pplication of this rule is rare and the

standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it." Id.

A defendant cannot appeal to this exception by merely showing some inconsistency or irregularity in a witness's testimony. Cowan v. State, 783 N.E.2d 1270, 1278 (Ind. Ct. App. 2003). Rather, a defendant must show that the witness's testimony "runs counter to human experience" such that no reasonable person could believe it. Campbell v. State, 732 N.E.2d 197, 207 (Ind. Ct. App. 2000). Moreover, the rule does not apply when testimony is corroborated by additional witnesses or circumstantial evidence. Thompson v. State, 765 N.E.2d 1273, 1274 (Ind. 2002).

> Although it has not been stated for some time, our Supreme Court has opined that
>
> it is the jury's function, not ours, to weigh the evidence, whether conflicting or uncontradicted, from which discordant, yet reasonable inferences may be drawn and then determine whether such evidence excludes every reasonable hypothesis of innocence. . . . On review, however, we must pass on its sufficiency as a matter of law.

Gaddis v. State, 253 Ind. 73, 80-81, 251 N.E.2d 658, 662 (1969).

> Moreover, the Gaddis Court recognized that we
>
> must be particularly vigilant where a conviction is supported by the testimony of one eye witness. Testimonial errors resulting from imperfect recollection, defective perception or suggestion have been shown to occur and we would be careful not to implement a miscarriage of justice in such a situation where that testimony is the only testimony of appellant's guilt.

Id. at 80; 662.

To begin, a more detailed recitation of A.L.'s testimony is needed. When A.L. was asked whether she had been upset when her birthday party was postponed because her stepmother's father had a heart attack, forcing A.L. to share a party with her brother,

9

she answered, "I don't remember." Tr. p. 45. A.L. also testified that she had forgotten about going to the mall between the time of her shared birthday and the time the family rented a movie. Id. at 46. A.L. did not remember what movie they had rented, acknowledged that she had not watched much of it, and that she could not remember that she had planned on watching the movie beside her stepmother. Id. at 46-47. A.L. testified that while she and her stepmother went to the kitchen to make popcorn, her brother took her spot next to their stepmother. Id. at 47. While A.L. acknowledged that this upset her, she did not remember grabbing her stomach and lying down. Id. at 47-48. A.L. also testified that she had given her cell phone to her brother and that she was angry that her father had not bought her a Blackberry for her birthday. Id. at 50-51.

When asked what her father's "hand was doing when [she] felt it[,]" she replied "I don't remember." Tr. p. 35. The questioning then became more specific: "Was his hand touching you on the outside of your private, or the inside of your private or neither or both? Where was his hand touching specifically?" Id. at 36. Then, A.L. answers with less than certainty, "Kind of inside I guess you would say." Id. When A.L. was questioned regarding which hand Leyva was using, she answered, "I don't know." Id. at 51. The same answer was given to the question, which fingers he used during the molestation. Id.

A.L. then went on to testify that she felt Leyva's fingers "[l]ike half inside, half not," and "[n]ot all the way" inside. Tr. p. 36. A.L. stated that Leyva used more than one finger because she "could feel" but that she "moved right away." Id. at 52. More specifically, A.L. turned on her side toward the back of the couch and Leyva put his hand

10

"[b]ack beside him." Id. at 36-37.  A.L. then got up, went into the kitchen, and looked at the time.  Id.  She went upstairs to the bathroom and then looked for a phone to call her mother, but could not find one.  Id.

When A.L. was first asked what she did after she could not find a phone upstairs, she answered, "I don't remember."  Tr. p. 38.  A.L. was then prompted, "Did you stay upstairs or did you go somewhere else?"  Id.  A.L. responded, "I grabbed a blanket and I went downstairs and laid by my step-mom."  Id.  A.L. stated that when she went downstairs, Leyva was standing at the bottom of the steps and asked her what she was doing.  Id.  After explaining to him that she had used the bathroom, she laid down beside her stepmother without waking her or her siblings.  Id. at 38-39.  A.L. testified that she "laid on a phone [but] [she] didn't want to move because [she] didn't know if [her] dad was watching [her]."  Id. at 39.

The next day, Easter Sunday, A.L. testified that she received her Easter basket. When asked if they had gone to church, she stated, "I don't think so."  Tr. p. 40.  A.L. also testified that despite having a good relationship with her stepmother, she did not say anything to her about what had occurred the night before and waited until that evening when her mother picked her up.  Id. at 40-41.  Additionally, A.L. acknowledged that she had asked her father if she could live with him prior to the incident because she did not want to attend a new school, but when questioned whether she had asked him on Easter Sunday, 2010, she responded, "I don't remember that."  Id. at 62.

When A.L. was asked how she felt about her father, she responded, "I still love him, and I forgive him, but what he did was wrong."  Tr. p. 43.  In addition, A.L.

11

acknowledged that this was the "first or only time that this has ever happened[.]"  Id. at 63.

In response to a juror question whether A.L. had been upset with her father that weekend, A.L. stated "No."  Tr. p. 63.  However, when counsel followed up on this response, A.L. admitted that she was "upset with him for maybe an hour," when she did not get the Blackberry.  Id. at 64.

A.L. was eleven years old at the time when the alleged molestation occurred; however, as shown from the above recitation of A.L.'s testimony, she fails to recall many of the events and circumstances that occurred during Easter weekend 2010.  It is interesting to note that A.L. does not remember the events that do not reflect positively on her, such as her anger towards the fact that she had to share her birthday party with her brother and that she refused to watch the movie after her brother took her place on the floor next to their stepmother.  Even more noteworthy is A.L.'s response to a juror's question that she had not been angry with her father that day when she had testified earlier that she had been angry with him for not buying her a Blackberry and that she had given her brother her cell phone in anticipation of receiving a Blackberry from Leyva for her birthday.

Furthermore, in my view, the circumstances surrounding the alleged molestation run counter to human experience.  A.L. testified that this was the first and only time that her father had touched her inappropriately.  Nevertheless, according to A.L.'s testimony even though she was eleven years old and, fully aware of what was occurring, he chose the living room where the entire family had gathered to watch a movie.  Additionally,

A.L. did not tell her stepmother what had happened, despite having a good relationship with her. Indeed, A.L. did not tell anyone on Easter Sunday until her mom picked her up that evening around 6:00 p.m.

Moreover, I cannot agree with the State's contention that there is circumstantial evidence supporting A.L.'s testimony, insofar as male DNA was found in A.L.'s underwear. First, Erica Felgel, a forensic scientist with the Indiana State Police, testified that "I can just say it's male DNA, that is all." Tr. p. 79. Perhaps even more compelling, the underpants that were collected and tested were not the same underpants that A.L. was wearing at the time of the incident. Id. at 113.

Finally, I cannot overlook the fact that A.L. had a motive to fabricate. Indeed, during part of A.L.'s testimony she admitted to being angry with her father for not buying her a Blackberry. Tr. p. 51. But in a response to a juror question, she initially answered that she was not angry with her father the night of the incident. Tr. p. 63. Thus, there was some inconsistency and a motive to fabricate presented in A.L.'s testimony.

In sum, I think that all of these circumstances make A.L.'s testimony incredibly dubious. I believe that it would be wise for us, as an appellate court, to draw upon the words of our predecessors, reminding us that while we should respect the province of the jury, it remains our responsibility to determine whether there is sufficient evidence as a matter of law. Likewise, we should be vigilant when a conviction is obtained on the basis of one eyewitness, so that we do not execute an injustice.

Notwithstanding the incredible dubiosity rule, I believe that it is time to consider whether we should require corroborating evidence when these type of offenses are

13

supported only by the testimony of a single witness. Sir Matthew Hale, Lord Chief Justice of the Court of King's Bench from 1671 to 1676 wrote at length regarding rape and famously stated:

> "It is true rape is a most detestable crime, and therefore ought severely and impartially to be punished with death; but it must be remembered, that it is an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, tho never so innocent."

People v. Rincon-Pineda, 14 Cal.3d 864, 874, 538 P.2d 247, 254 (1975) (quoting 1 Hale, History of the Pleas of the Crown (1st Am. ed. 1847) p. 635)).

While we no longer punish rape with death and are aware that many victims of sexual assault never come forward because of fear or embarrassment, there is still some truth in Lord Hale's observation, inasmuch as it is a detestable crime that is hard to prove and, many times, hard to defend, especially if the only evidence against the defendant is the testimony of the victim.

Requiring corroborating evidence would not be a novel concept in the law. For instance, we require corroborating evidence to establish the corpus delicti of the crime before a defendant's confession can be introduced into evidence. Willoughby v. State, 552 N.E.2d 462, 466 (Ind. 1990). The primary function of the rule is to reduce the risk of convicting a defendant based on his confession for a crime that did not occur. Id. If we require such corroboration in circumstances under which the defendant has admitted to criminal conduct, it is not unreasonable to require corroborating evidence in circumstances where he claims innocence.

Moving forward to cases more analogous to the instant one, several of our sister states and the District of Columbia require corroborating evidence where the victim is a

14

child.  See Curry v. United States, 498 A.2d 534, 545-46 (D.C. Cir. 1985) (stating that when a sexual offense involves a nonmature minor, instructions must be submitted to the jury requiring a finding of independent evidence corroborating the victim's testimony); People v. Powell, 138 Ill.App.3d 150, 156 (Ill. App. Ct. 1985) (stating "[i]t is well settled in Illinois that when a conviction for taking indecent liberties with a child depends upon the testimony of the prosecuting witness, and the defendant denies the charge, there must be substantial corroboration of the prosecuting witness by some other evidence, fact, or circumstance in the case; or the testimony . . . must be otherwise clear and convincing"); Wright v. State, 859 So.2d 1028, 1030 (Miss. Ct. App. 2003) (stating that the uncorroborated testimony of a victim is sufficient to support a conviction where that testimony is not discredited or contradicted by other evidence); State v. Fears, 217 S.W.3d 323, 332 (Mo. Ct. App. 2007) (concluding that each child victim offered uncontradicted testimony corroborating the testimony of the other); Shepard v. State, 244 S.W.3d 421, 423-24 (Tex. Ct. App. 2007) (opining that the corroboration requirement contained in the solicitation statute requires that "we eliminate the minor victim's testimony from consideration and then determine whether there is other incriminating evidence tending to connect the accused with the crime"); State v. Craig, 361 N.W.2d 206, 214 (Neb. 1985) (stating "[t]he general rule is that testimony of the victim of sexual assault must be corroborated as to material facts and circumstances which tend to support the victim's testimony and from which, together with the victim's testimony as to the principal fact, an inference of guilt may be drawn").

With the advent of modern technology, including DNA testing and analysis, it is not unreasonable to require some form of corroborating evidence before convicting a defendant when the sole witness is the victim. This is especially true when the defendant has been accused of child molesting and similar offenses, insofar as if convicted, he will not only be sentenced accordingly, but also subject to certain registry and residency restrictions. See Ind. Code § 35-42-4-11.

Lord Hale was correct when he recognized that sexual assaults are heinous. Indeed, they are particularly atrocious when they are perpetrated against our children, over whom our natural inclination is to protect. But we must be mindful that the disgust that such actions elicits cannot cloud our reason such that we permit guilty verdicts to stand even when they were not obtained by proof beyond a reasonable doubt. I believe that the State failed to prove beyond a reasonable doubt that Leyva committed class A felony child molesting in this case, and I would reverse.